and Watson. Thank you so much. Thank you. May it please the court. Robert Culpa signed counsel on appeal for Taj Wiley. Mr. Wiley is serving a 144-month sentence for drug conspiracy after a trial and sentencing founded predominantly on speculation and words and intercepts among individuals lacking discernible connections to each other without any testimony from a co-conspirator, supplier, or buyer to provide context and proof. Although significant quantities of drugs were seized from separately tried co-defendant Kenston Harry, the jury acquitted Wiley of responsibility in particular for a kilo of fentanyl seized at Harry's residence, but he found himself convicted of an indeterminate fentanyl conspiracy on insufficient evidence and sentenced for the full amount without proper findings. That's my meta theme. I know it's been a long day, and I'm glad I thoroughly briefed the case. I'm just going to try to touch in my time on three of the issues that I've briefed. One is that last one, the sufficiency of the indeterminate fentanyl conspiracy. The second one I'd like to touch on, if I have time, is the denial of the multiple conspiracies jury instruction. And the third is the drug quantity findings, or I would say lack thereof, that resulted in sentencing. I'm sorry? Do you mind starting with the last one first? Last one first, sure. So the PSR was produced in this case and recommended, I don't have the exact numbers in my head, but a drug equivalent amount of I think 50 to some hundred kilos. And Mr. Wiley's counsel disputed them both on merits in a number of cases and also pointed out that a lot of this was acquitted conduct. Now, acquitted conduct under the law at the time is permitted to be considered at sentencing, but this court in the Vaughn case had said that the court should still take into consideration that it is conduct on which there was an acquittal in determining whether to take it into consideration. Now, the judge who tried the case said, oh, that doesn't matter whether you include the acquitted conduct or not. I'm oversimplifying her exact words. It was on the drug quantity. So on the drug quantity calculation, the government argues the district court didn't rely on the PSR and said that any sort of conversion error was unimportant. What's your response? Right. So there's two ways to interpret that. I interpret it as the judge making mistakes. Acquitted conduct absolutely mattered because it would go down levels. But I'll respond to the government's argument. They say, oh, no, what the judge meant was that she was adding in drug quantities that were not even in the PSR. Now, I think for the judge to do that, there has to be a finding. There has to be specific findings. This court has said we need specificity when it comes to drug quantity. That's Shinobi and a whole line of cases. And, yes, the government did try to add some things in, but first of all, there were no findings. Second of all, if you look at some of them, they border on the ridiculous . . . I mean, even though the standard of proof is lower at sentencing with drug quantity, there still has to be either a transaction or some sort of agreement. And one of the examples they give . . . I'm sorry. It's all cocaine, right? Isn't that what . . . I mean, in your view, tell me what the district judge concluded that got up to 3,000 kilograms of what used to be called marijuana equivalents. Right. Well, a lot of that is fentanyl, but that's the acquitted conduct issue. But in terms of the government adding additional quantities in, it is cocaine, Your Honor. I'll give an example that really strikes me, and I try to highlight this in the reply brief. Well, excuse me. To me, I'm not being clear. Are you saying that the only way you get to 3,000 is if you include the fentanyl, the 400 grams or whatever it is, a kilogram, whatever it is of fentanyl at Harry's Place? You either have to include the fentanyl, or if, as the government says, if you disregard the fentanyl, because I'm saying that she's mistaken, that it doesn't matter . . . Right, right, right. . . . then they move to cocaine that's not in the PSR, and she never made any findings on it. There's an eight-kilogram non-transaction that they're citing that relates to this fellow as nondegair as Al Springfield. And the government argues that . . . But isn't there . . . I mean, look, he's talking to the guy who provides the cut, and he's saying how much cut he needs. Is there not a reasonable inference from how much cut he needs to some quantity of cocaine? I don't think this one is cut. I think what the government is saying is . . . I think that's what Al Springfield was about. He was the supplier. He was a supplier of cut. That's the government's theory, there's no doubt. But the one that they try to add in is this time where they say in the intercept, it says that my client says, I grabbed two. And they say that means you grabbed two kilos of cocaine. And it's quite clear that he didn't. He was offered ten and grabbed two on their theory. But they put the additional eight kilos in anyway. On what theory? I don't know. I don't know that you can include refused quantities of cocaine in drug quantity. I mean, you've either got to have a transaction or an agreement, not a refusal. So that's my point with that. That's the main one. There's a second example with this guy, Whiz BK, where the government had been saying all along that there's 900 grams of cocaine. And then all of a sudden, based on the words of someone else entirely, they say, oh, no, we're going to change that one to two kilos. And this is not even in the PSR. And the judge never said, oh, I'm adopting those arguments. She said, oh, it doesn't matter. I think that's really inappropriate, whether you look at it from the acquitted conduct perspective or the added quantities. And why did she say it does not matter? What she said, she was responding to the acquitted conduct argument, as I understand it. And she says, it doesn't matter whether you include the drugs that were seized at Harry's, co-defendant Harry, who was tried separately. Whether you include those or not, you easily get over the threshold. So she was saying it doesn't matter whether we include acquitted conduct or not, but it does. So what she's saying is, if I exclude the fentanyl, there's still enough drugs of other sorts that you easily get over this amount, the threshold amount for the offense level that was calculated. It's a little unclear what she's saying, but I think that's what the government is saying. You have other routes to get over the 3,000. And I don't think what they're saying is legitimate at all, those additional kilos. That's the focus of the argument here is there's not a sufficient finding that the number of kilos of cocaine is sufficient to come to that 3,000 number. Yes. Without the conversion error, right? I'm sorry? Without the fentanyl. There's an additional conversion error with the marijuana. I don't know if you want to – But I think there's no question. They acknowledge that. I think we have to take as given that the judge is representing that she's not considering the fentanyl because she's saying it doesn't matter because of this. So to whatever extent it does matter is a question that we don't have to reach, doesn't even come up, because she is saying I'm resting it on drugs other than that. Yes. Okay. The question is there's an inadequate basis for a finding and an inadequate finding of how you get to that number.  Absolutely. So I had – I realize I'm over, but I've noticed you've been very understanding today. Yeah. We'll give you another minute or so to address – So I could either go to the jury charge, to the multiple conspiracies charge, or the fentanyl sufficiency. Since we've been talking about fentanyl, I'll jump onto that one, too, and I think we're going to hear about the multiple conspiracies charge from the co-defendant in addition. But on the fentanyl conspiracy, just to set it up, the first indictment in this case, which was based on the intercepts but not the seizures, which hadn't taken place yet, there was no fentanyl charge. Then there was a seizure, and at co-defendant Harry's location, there was a kilo of fentanyl found. Okay. Well, the jury acquitted Mr. Wiley of 400 grams or more of fentanyl, in other words, of that fentanyl. There was no other conceivable quantity of fentanyl that high. They acquitted him, but yet they returned a guilty verdict for an indeterminate fentanyl conspiracy. And the government pulls in these three snippets from the intercepts to sort of bolster, though. Yeah, the snippets are nice, though. What about the snippet where he's talking to, apparently, Harry, and saying, you know, wear the mask because we've got Fetty here? That's not Harry. That's an over here with, I think her name is Sashary Feliz. You mean with the mask? Yeah, the mask. Put your mask on.  Yeah. So he's apparently with, he's talking to Sashary Feliz, apparently, about marijuana, and then there's someone he's with, and he's yelling at him, what are you doing with that fentanyl? There's no evidence that it's Mr. Wiley's fentanyl. I mean, this is literally guilt by association with an unknown person. We don't even know who he is. So I don't even see where there's an argument that, I mean, it's standard in jury charges and in this court's sufficiency jurisprudence, just because you're with someone who's dealing drugs, you need more, or has drugs. He could have been using it for his own personal use, for all we know. So I don't think that one shows anything. And the other two, forgive me if I'm jumping on you. No, go ahead. The other two, one is a conversation with Harry, and there's a message to Harry from my client saying play for the, is there a play for the F or words to that effect? Well, we don't know what F means. The government's own experts said F could be fentanyl. It could also mean fire, which is drug lingo for any drug that has unusually strong characteristics. And also Harry doesn't answer them. And then the third one is this Al Springfield guy again, where, to me, it's pretty clear from the words that Springfield is saying, you're not talking about Effie. And then they use the term dog food, which their own experts said was heroin. So I think this is a case where I cite Pauling a lot in my brief and in many contexts, but Pauling talks about the distinction between reasonable inferences and speculation. And even if it's reasonable, speculation isn't appropriate, and I think that is that line there. So would you like me to hold off on multiple conspiracies maybe, since I think he's going to address it as well, but in a different context. I think it's a very important issue. If you want me to speak now or. Well, you've got some rebuttals, so if we need to. Thank you. Thank you. May it please the court. My name is John Einhorn from New Haven. Excuse me. I represented Javon Watson at trial and, of course, on appeal. Mr. Watson was only found guilty of conspiracy to possess with intent to sell a detectable amount of marijuana. But the issue I wanted to raise before this court has to do with his career offender enhancement. I know, Your Honor, and obviously Your Honor was on the panel with Richardson, but I think that Richardson and Lopez-Bright really set different standards. In Richardson, Your Honor's panel talked about the issue that the commentary, that is to say the guidelines commentary to 4B1.2b, was not inconsistent with the guidelines. And I think that's a different standard from the standard set forth in Lopez-Bright. The standard there was is it ambiguous and is the commentary more expansive? And I think I would ask this court, this panel, to take a look at Richardson in light of Lopez-Bright v. Raimondo, because I think there is a distinction in the nature of the scrutiny given to the commentary and the guidelines based upon that new case. The significance for Mr. Watson was it was real. His guideline range was found to be 51 to 60 months, 60 because it topped out at a max. But without the career offender, he'd be looking at 18 to 24 months. He got 44 months. Now, he received three years supervised release, which he's still on, and obviously that's discretionary with the court, three years to life either way. But I would ask, Your Honor, based upon a review in comparison of Richardson to Lopez-Bright, that the matter be sent back to the, well, Judge Arderton retired, but sent back for resentencing. What does TAB do, United States v. TAB? I'm sorry, Your Honor. United States v. TAB? What, what? United States v. TAB, that's one of the other arguments that the government cites in addition to Richardson. Yes. The same thing. I think the significance of the commentary is what the issue would be here. That's what I would ask Your Honors to look at, what the significance of it is in light of Lopez-Bright. I realize we're talking about the guidelines here and not about something that's nondiscretionary. But even so, the guidelines themselves make a significant difference, even though they're not mandatory to a sentencing judge. And in this case, it made a significant difference to my client. In terms of the multiple conspiracy issue, this is one of those cases where it really did make a difference. Because at closing argument, trial counsel for Mr. Wiley stood up and said that Mr. Wiley admits he was part of the conspiracy. My client denied he was part of the conspiracy. And we had requested, actually all counsel had requested a multiple conspiracy charge. The government would say that you hadn't shown separate networks operating independently of each other, as opposed to different branches for a single operation. How would you respond to that? I'm sorry, Your Honor? The government argues that you had an obligation to show separate networks operating independently of each other. Oh, I see. But we have different branches for the same operation. How would you respond to that? I think the obligation and the burden of proof is obviously on the government to show that this was part of the same conspiracy. They can't delegate that obligation to us. When they put forth evidence as to what the conspiracy consisted of, the marijuana segment of that so-called conspiracy involved different facts as to Mr. Watson. His only connection to the marijuana in Mr. Harry's shop was that he knew it was there. But the connection of Mr. Watson to the cocaine that was in this conspiracy was tossed by the jury. They found him not guilty. I don't understand, though. I mean, if defendant 1 operates a large drug emporium with all kinds of drugs involved, and somebody plays a role in one piece of his business, and that's limited to one particular drug. Well, first of all, let's say instead of three different drugs, it was one drug. Yes. But the guy with the emporium has like ten salesmen working for him. And one guy just comes in and does a couple of deals over here. He's joined the same conspiracy. Yes, I agree. Absolutely. Even though he doesn't necessarily know. He knows it's bigger. He knows this guy has more irons in the fire than just his. He's still part of the same conspiracy. Absolutely. So why is it different if the same conspiracy involves not just ten other marijuana dealers, but five other marijuana dealers and five fentanyl dealers, and that's the big conspiracy that he joins? He's only held accountable at sentencing for what was reasonably foreseeable to him, and that's what happened here. But hasn't he joined the same conspiracy? No, Your Honor. Using Your Honor's analogy as to the warehouse, the drug warehouse, my client was never part of that drug warehouse. He was never. The marijuana that he was involved in, and there is some evidence that he was talking to people on the phone, there are people who are never connected to the warehouse conspiracy, using the analogy again. They're connected to Mr. Wiley, right? He's dealing with Mr. Wiley. He talks to Mr. Wiley I think maybe twice on the phone, and they talk sort of about marijuana, but they don't talk about marijuana in the sense that it's part of the, again, the warehouse conspiracy. So I think that the – Well, but I mean if, again, if it was the exact same conversation and the conspiracy that was alleged was basically centered on Wiley Yes. and dealt with lots of marijuana that had nothing to do with Watson. Right. You would still say that's the same conspiracy that Watson joined when he agreed with Wiley about marijuana. I do, but I think – So why is it different if instead of ten tons of marijuana, that's the rest of the conspiracy, if it's one kilo of fentanyl that's the other part of the conspiracy? Why does that make a difference to what Watson joined? Sure. He joined Wiley's group. He joined Wiley's group, and I think the evidence, though, is – and this is where it was important to have a multiple conspiracy charge – is that in addition to that, the nexus to the marijuana was based on phone calls to third parties, to other people. I mean Mr. Watson I think the government showed was – I forgot the names, Felix or something, or Alex. But whatever was going on with Mr. Wiley and his cocaine and maybe fentanyl and marijuana had nothing to do with my guy. He has nothing to do with Wiley's marijuana is your position. He had nothing to do with – Watson had nothing to do with the cocaine, and the jury agreed with that. He had nothing to do with Mr. Wiley's warehouse operation, and the jury found him not guilty of that. He was found not guilty of conspiring about fentanyl. He wasn't charged with fentanyl. Okay, he was charged only with – Cocaine and weed. And they found him not guilty of the cocaine. They found him not guilty of that. But guilty of the marijuana. But guilty of the marijuana, and it was based upon solely – first of all, there was a photograph that was found in his phone. But are you saying that he was not guilty of conspiring with Wiley to sell marijuana? No, they said he was guilty of the conspiracy. Yes, they found him guilty of the conspiracy to sell a detectable quantity of marijuana. Yeah, but that just means that the government isn't seeking B-level amounts of marijuana. No, it's B1D. So he joined what? I mean, are you saying that to whatever extent this is a conspiracy with Wiley to deal in marijuana, he's not guilty of that? Yes, that's right. He's not guilty of that and a multiple conspiracy charge. He's not guilty of conspiring with Wiley at all. Right, he wasn't. They were friends. They knew each other. They talked. But a multiple conspiracy charge here, which all counsel wanted, I think would have allowed the jury to separate out what Mr. Watson, who is all I care about, what Mr. Watson was doing with his marijuana. And then to put the frosting on the cake, as it were, at closing argument, as I was saying, trial counsel for Mr. Wiley said to the jury, well, Mr. Wiley admits he was a party to the conspiracy. Now, he didn't mention my client by name or that my client was a party to the conspiracy, but I stood up after that and said no. Mr. Watson disagrees that he was part of the conspiracy and there was no time at that point to get a severance based upon the inconsistencies there. So I think this is a case that shows the hazards of not giving a multiple conspiracy charge. All right, thank you very much. Thank you. Thank you. Mr. Darrington, whenever you're ready. Good morning. Thank you very much. May it please the court. My name is Robert Darrington. I'm an AUSA from the District of Connecticut. For the reasons discussed in the government's brief, this court should affirm the judgment of the district court for both defendants Wiley and Watson. At trial, the jury heard more than sufficient evidence to support the verdicts against both defendants. As the court is aware, this was a wire case where the DEA intercepted numerous communications between Wiley and his co-conspirators showing that Wiley was the hub of a conspiracy that involved the distribution of wholesale quantities of cocaine as well as marijuana and fentanyl. Additionally, the government seized the defendants' phones during their arrests, and upon examination, those phones as well contained communication showing evidence of the drug trafficking conspiracy. Additionally, the government provided an expert in this case who described the packaging and distribution of narcotics, the communication habits of drug traffickers, as well as the coded language that drug traffickers often use, which is prevalent throughout this case. During the trial... So perhaps you could... I understand you're sort of summarizing some of the evidence. Perhaps you could direct your argument a little bit more specifically to perhaps the last thing we heard regarding Watson's involvement in the conspiracy or lack of, as your opponent is suggesting, regarding his involvement with anything other than marijuana. Certainly, Your Honor. I think it's important to clarify a couple things. One is that Wiley's counsel, at closing argument, admitted that Wiley was in a conspiracy regarding cocaine and marijuana with Harry. As counsel said, he made no mention of Watson during that argument. An additional point I will make is that, and I'll refer Your Honors to the record in this case, is that although counsel argues that there's no evidence that Watson was connected to this conspiracy through marijuana at all, that's simply not true. And I'll point Your Honor's attention to the government's appendix on 1476 through 1477. And those are text message communications between Wiley and Watson. Specifically, Wiley tells Watson, quote, grab the two and three runts. That price cool. Watson states, bet. Wiley then states, I'm going to give you your points in it too. And it was reasonable for the jury to conclude that runts was a reference to marijuana in this case. Additionally, there was a video sent on March 30, 2021, in which Watson sent a video of marijuana to a contact in his phone named Flex Hartford. They include the address of Action Audio. For Your Honor's benefit, Action Audio is the business in the north end of Hartford, which was owned by Kenseth Harry, one of the co-conspirators in this case. So simply put, there was ample evidence for the jury to conclude that Mr. Watson was involved in a drug trafficking marijuana conspiracy with Mr. Wiley. Now, it's certainly true, as counsel stated, that Mr. Watson was acquitted of the B1B charge for cocaine. Certainly, the government argued that he should have been convicted of that, but the jury did ultimately acquit him of that charge. So effectively, he was convicted of a separate conspiracy with Wiley to deal in marijuana, as opposed to a distinct objective of the conspiracy with Wiley to deal in cocaine. Your Honor, I believe the evidence showed that it was all the same conspiracy. Yeah, I understand that. I understand that. But in terms of what prejudice could have fallen to Watson from the absence of a multiple conspiracy conviction, effectively what he's convicted of – I think Mr. Einhorn is arguing that there was no evidence that he dealt in marijuana with Wiley. And assuming that runts means marijuana, then that sounds like that conversation is precisely a transaction with Wiley to engage in the distribution of wholesale quantities of marijuana. That's correct, Your Honor. But whatever prejudice may have come from some notion that that – I think Mr. Einhorn's argument is Watson's marijuana dealing is entirely distinct from Wiley. If there is a – and you just presented evidence to suggest that that's not so. To whatever extent there's an argument that Watson was prejudiced by the absence of a separate conspiracy charge because he was only involved with marijuana rather than with cocaine, that argument – there can't be any prejudice because he was acquitted of any involvement in anything involving cocaine. If he had been separately charged – if Wiley was charged with two conspiracies, a marijuana conspiracy with Watson and a giant conspiracy with a whole bunch of other people, it would come out the same way because all he was convicted of was conspiring with Wiley about marijuana. That's correct, Your Honor. There certainly was no prejudice in this case for the lack of a multiple conspiracy charge to the jury. And it's important to note that what the district court judge actually did charge the jury was that the government had to prove the existence of the, quote, charged conspiracy and that the government must show that the defendant joined that conspiracy. And as the district court said, it actually allowed the defendants who believe the theory of the case was multiple conspiracies that they could, in fact, argue multiple conspiracies to the jury. But ultimately, the district court judge examined the evidence and found that such a multiple conspiracy instruction was inappropriate based on the evidence. But to the second point of the multiple conspiracy charge, as Your Honor points out, he has to show some sort of bias. And that certainly wasn't the case with Mr. Watson because they did acquit him of the cocaine charge. But the same is also true of Mr. Wiley because the government charged him with the B1A fentanyl charge and ultimately he was acquitted of that charge as well. So there really wasn't any – or I could say there was not any prejudice to either defendant for the lack of a multiple conspiracy charge. So can we talk about the sentencing for drug quantity for Wiley? So with respect to the drug quantity calculation, my understanding of your argument is that the district court didn't rely on the PSR. If we disagree, does that error require a remand? No, Your Honor. I believe the court did review the PSR and relied on certain – relied on parts of it. But ultimately what the district court said was that it was basing its drug quantity upon the intercepts from the wire. And there were some – I believe there were some drug quantities from the wire that were included in the PSR. But the district court, as Your Honor has pointed out earlier, the district court judge in its sentence ultimately decided that there was adequate basis for the drug quantity based on the wire intercepts themselves. And the district court judge – Whatever generalized reliance on things in the PSR the district court may have done, it was specifically put to the district court that it would be error to include the fentanyl amounts. And she said, yeah, but that doesn't matter because – so that in effect her calculation was independent of the fentanyl. But what was that calculation? A, how do we know what the district court's calculation was? And B is what is the government's theory as to how a reasonable district judge could find by a preponderance of the evidence enough cocaine and marijuana to reach the 3,000 number? And I'd appreciate with some specificity because I couldn't make the math work. Yes, thank you, Your Honors. As Your Honors pointed out, the district court judge did say that putting aside the seizure amounts from June 9th, which include the fentanyl, the district court could still arrive at a drug quantity that was at least 3,000 converted kilograms, which putting in cocaine terms was at least 15 kilograms of cocaine. The district court judge did not break it down and do the arithmetic on the record. However, the district court judge was the judge who tried the case, was aware, did in fact hear all of the wire calls during this case and ultimately decided that based upon those wire calls that there was in fact at least 15 kilograms of cocaine. Now in terms of breaking it down and doing a little bit of math, we attempted to be helpful in this regard, and this is on pages 88 through 90 of the government's brief in which we pointed out various wire calls and the amounts describing those calls in which the government describes could arrive at 15 plus kilograms of cocaine. And I'm happy to go through some of those transactions here now, if the court will indulge me, beginning with the Yonkers kilogram. Now Mr. Wiley was arrested in Yonkers, New York on February 9th, 2021, and during that arrest he admitted that he had a kilogram. He in fact did have a kilogram of cocaine on him. The lab tested I believe up to 400 grams of that kilogram, which I believe was the threshold for charging in New York. And at least Harry is involved with that transaction, because we have the phone conversations where Harry says, good thing I wasn't along with you on that ride, because then I'd be in jail too, implying that there was a good chance that he would have been along on that ride had it not been that something else came up. So that's – I'm just tying that to the conspiracy, not just to Wiley. Absolutely, Your Honor. I believe Wiley said that he wished he had gone with his gut. Yeah, but that's – anyway, that's one. Yeah, and that's – certainly, that's just one kilogram. But walking through the rest of the transactions, there are two kilograms which the government associates with WSBK. Now in support of that, the government provided text messages showing that WSBK had texted to Wiley a text snapshot in which there was an offer of two white girls, which a jury could reasonably infer were two kilograms of cocaine. Throughout the text message conversation, it goes on to show that – and this was in the middle of April. On April 27th, Mr. Brown, Watson, and Harry met at Action Audio. They then put a bag in Mr. Wiley's car, drove to Mr. Harry's residence in Bloomfield, Connecticut, packaged the cocaine that night. And the following day, Myron Brown drove – transported the cocaine to New York to WSBK. During those communications, they referenced 900 grams. But based upon the prior text messages, it's apparent that there were at least two kilograms that were offered to Mr. Wiley. And based on the fact that the text messages show that the cocaine was obtained by Mr. Wiley and then packaged in a specific way, transported back to WSBK in New York, the government interprets that to be – and I believe the district court did as well – that that would be at least two kilograms of cocaine. So that's three kilograms there. There's a kilogram that's associated with Sachery Feliz. And this was based upon a phone call that occurred on, I believe, April 27th in which Ms. Feliz, who was a co-conspirator of Mr. Wiley's – there was a relationship between the two of them in which they were drug trafficking. Ms. Feliz offers Mr. Wiley one kilogram. Now, Mr. Wiley says, as counsel points out, that he did not actually – he declined that – or there's no indication that he accepted it at least. He said that he – he indicated that he had enough cocaine at that time but said he would go check it out. So based on the fact that this was a conspirator of Mr. Wiley's offering a kilogram of what the evidence showed was cocaine, we associate one kilogram there. The evidence also showed that on May 6th – the night of May 6th into May 7th, Mr. Wiley and Mr. Harry were packaging cocaine at Mr. Harry's residence in Bloomfield, Connecticut. On the following morning, Mr. Wiley made several phone calls to several of his co-conspirators. One of those co-conspirators – and this is on page 89 – was a contact that was an unknown contact from Rhode Island. And in that conversation, Mr. Wiley is offering him a kilogram of cocaine. There are certain indicia from the phone call indicating – making clear that this is cocaine. There's a reference to cooking it and there's also a reference to this is the stuff that caused Mr. Wiley to be locked up for a bit. And it's reasonable for the judge to believe that that's a reference to Mr. Wiley's Yonkers arrest in which he was in fact detained because he had a kilogram of cocaine. So the phone call with the contact in Rhode Island, that's one kilogram. During that same day, after the packaging, Mr. Wiley makes a phone call to Mr. Munoz. Peter Munoz, he's a co-defendant as well as co-conspirator in this case. It's made clear during the call that Mr. Wiley's offering him 300 grams of, quote, white girl. So again, this is cocaine. He offers him a sample of it as well. So there's – the government attributes 300 grams to that transaction. And then there's 200 grams listed with Mr. – with Harry. In mid-May, there was a voice memo Wiley poured to Harry that he was waiting for his boy to grab the 200. So 200 grams there, which is a smaller amount, but which gets to one of the larger, what the government calls a big ticket amount, is with co-conspirator Al Springfield. We've got five and a half, and the 10 with Al Springfield is really the key to getting you to 15. Yes, Your Honor. I believe we call it in the brief one of the big ticket items. And as Your Honor mentioned earlier, Al Springfield was somewhat – was a co-conspirator of Mr. Wiley's. He was someone who provided cutting agent. On the night of May 6th into May 7th, when Mr. Wiley and Mr. Harry were packaging cocaine at Mr. Harry's residence, Mr. Wiley stepped out, went up to Springfield, Massachusetts, where he met with Al Springfield. And this is evident through cell site analysis. Went up there. Based on the communications with Mr. Springfield, he obtained cutting agent, and then he traveled back to Mr. Harry's residence in Bloomfield, Connecticut, where they continued packaging cocaine. Now, there are several – two important phone calls with Al Springfield that get the number up to as high as it goes. I think we have 10-plus, but there's some indication that it might be as high as 14 kilograms. And importantly, the first phone call was, I believe, on May 7th. During this conversation, Mr. Wiley is asking for additional cutting agent. But then later in the conversation, Mr. Wiley mentions that his peoples are currently loaded with kilograms and, quote, they just offered him four for a buck, which a reasonable interpretation would mean four kilograms for $100,000, so $25,000 per kilogram. Mr. Wiley indicates that he had declined that, but then he notes in the conversation – but in the conversation he says that he and Al Springfield could have went half on those four kilograms. So based on the fact that Mr. Wiley is discussing, quote, his people we interpret to be his co-conspirators, that they've offered four kilograms, which Mr. Wiley is then attempting to sell to Al Springfield, those four kilograms are appropriately attributed to Mr. Wiley. Now, there's another phone call with Al Springfield approximately three weeks later. I believe this is May 28th. Wiley indicates to Al Springfield that, again, his, quote, peoples, a reasonable interpretation would be his co-conspirators, the suppliers of his cocaine, wanted him to grab ten of them. And then he – and this is on page 90 of the government's brief. He and Al Springfield go on to discuss the appropriateness of whether the price of those ten kilograms, I believe it was $25,000. But ultimately when Mr. Wiley attempts to sell those ten kilograms to Al Springfield, there's no indication that that sale actually went through. However, based on the fact that Mr. Wiley's peoples have ten kilograms that Mr. Wiley is then attempting or at least makes overtures towards selling to Al Springfield, the government attributes those ten kilograms of cocaine as well to Mr. Wiley. So your response to Mr. Culp, it seems to me, sounds like Mr. Culp is saying there's no indication here that he actually did make a ten kilo transaction with Al Springfield. You don't disagree with that? No, we do not disagree. But what you're suggesting is that if I own a department store and somebody is trying to figure out how much business I generally do and they talk – they have a conversation taped with me where I talk about buying X quantity of dresses and Y quantity of pants and all kinds of other stuff and that deal doesn't go through, the fact that I am talking about those possible deals, that these are realistic deals for somebody in my business to make, leads to a reasonable inference that the judge could find by a preponderance of the evidence that if that's what he's talking about in just one telephone conversation and it's sort of, well, but I don't need to do that because I'm stocked up with other people right now and if you can get me ten at a better price, I could do that maybe. Or if you can get ten at a better price, come back to me and maybe I can match that price or something of that sort. That tells you enough about the quantity of his overall cocaine business that the district court would be conservative in reaching the number 15 kilos for all the business that Wiley did in cocaine over the course of the conspiracy. Is that the idea? Yes, Your Honor, and that these, as Mr. Wiley says, his quote peoples who are trying to get him to purchase ten, that these are his co-conspirators, these transactions obtaining this amount of cocaine by his co-conspirators, what that means is that amount is foreseeable of cocaine in that quantity to Mr. Wiley. It's within his scope to do a ten kilo deal. That's absolutely correct, Your Honor. Is what, you know, based on all the deals that he does. And that's one occasion during the months, how many months did this conspiracy last? I believe this was February through June. Oh, just a, okay. So over a six month period, it's reasonable to infer that he did at least that much. Yes, Your Honor. Okay, that's the argument I make. Yes, Your Honor. Unless the court has any further questions, the government rests on its feet. Thank you. Thank you. So we strongly disagree as a matter of law that refused offers constitute drug quantity. I'm not going to go try to. Well, he's not being charged with possessing that amount on any particular occasion. He didn't do that deal. But if we're trying to engage in the enterprise, foolish as it always has been to tie these sentences to particular quantities that are foreseeable over a long period of time with a conspiracy. Why doesn't that tell us that this is a guy who is comfortably a ten kilo dealer? He can make deals for ten kilos. We've got him dealing in one. We've got him dealing in two over here. We've got him dealing in three over there. We've got him dealing in smaller quantities in other places. And now he's talking about – now you could say, I guess, it's also reasonable to think he's just bragging. He couldn't really do ten kilos ever. But that's a fact determination for a judge to make by a preponderance of the evidence having heard it all. It's worse than that. It's worse than that. Because I think that there's a misimpression here with the big ticket item. I'll stick to the big ticket item, that extra eight kilos that government admits he never transacted. He's conversing with Al Springfield about a conversation with someone else who we have no idea who he is. He doesn't even have a nom de guerre. They're just peoples. What more do we need than that? I mean he's saying this is my organization. This is what my people want to do. Someone unknown offered him ten. He grabbed two, and ten is the drug quantity? I don't think that's the law. I think we need either a transaction, a transaction that was either personally participated in or was foreseeable. This is Pauling. Or an agreement. We have none of that here. And I wrote down every time he said offered, there's like 13 offered kilos refused. I don't think that's the law. I really don't. That's not his argument. His argument isn't that any time somebody offers me ten kilos, that's one thing. It's if I'm discussing transactions of that size. Discussing? Yeah. Yeah. But I'm discussing them as this is my business is dealing in this level of stuff. This is what my people are doing. Yeah. Why is it not a reasonable way of estimating the scope of this conspiracy? I think this court has said in Pauling how you assess drug quantity. It's transactions you personally participated in, even if you don't know the actual quantity. That's one of the downsides of that prong. It's transactions you could foresee, transactions, not availability or possibility. And then the third one is the agreement. That's not only Pauling. That's Judge Sotomayor's opinion in Hendrickson that I cite in the reply brief. So I think you've got to touch one of those bases. I think availability from people is not enough. I don't mean to be disrespectful, but I don't think that's enough. No, you're not being disrespectful. I understand the argument. Yeah. And, again, I don't think that's even a conversation without – well, I made that point already. Can I get to a couple other things? I know you've had a long day. Just really quickly, both counsel mentioned the trial attorney's concession at the court, and it's limited. It's on 316 of Wiley's appendix. He says the government did prove we can see that there was a limited conspiracy with Harry to sell cocaine and marijuana. It goes on, but it's a limited concession. What he was arguing, and this will take me to my multiple conspiracy points if I could just make them very briefly and let you move on, is – so in addition to disputing individual transactions, this counsel was definitely saying that there were multiple conspiracies in this case that may have involved Wiley. And I don't think the fact that Wiley is in what are claimed to be multiple conspiracies disqualifies him for getting that instruction because the judge said to him you can – and this was a theory of defense. The judge said to him you can argue that. I'm just not going to give you the instruction. I don't know why that would be. Why would you not instruct the jury about something that she said to him you can argue to the jury? And there is prejudice. Because he didn't get convicted of three separate conspiracies. No, no. It's actually – I keep saying Pauling over and over again. It's my favorite case obviously, but I think Judge Atkins said it quite well in the district court version of – Pauling said it was a government appeal, so it was affirmed. And he says that the prejudice is that it allows the jury to combine drug amounts to push him into a higher category for the mandatory minimum and so forth. So, I mean, the government may say, no, no, this is all the same conspiracy with all the peoples and all that stuff. I get that. They're allowed to argue that. But I think that Wiley's counsel was entitled to have the jury instructed that there is this concept called multiple conspiracies out there, separate conspiracies or whatever, and to give them some guidance. He said that the Yonkers happened. There's no doubt. That was a kilo of cocaine. But he was arguing that it had nothing to do with the Connecticut conspiracy. So – Why does it have nothing to do with the Connecticut conspiracy when Harry is involved in it? I have a different interpretation of that – of that – of that – those phone calls because Harry is acting confused, thinking he got arrested for marijuana. So I don't know how in the know Harry was. That's – but my point is that Wiley's counsel was entitled to argue to the jury that the Yonkers was separate and that the Saucher-Feliz person was separate, too. And this is not a self-defining Wiley conspiracy. Right. He was entitled to argue those things, and the judge permitted him to argue those. What the judge didn't do was give this instruction. Yeah. So what is the – I think he – this court has said over and over again – I'm sorry for answering before you were done. But this court has said over and over again that you're entitled to a theory of defense instruction no matter how weak it is. And why isn't he able to argue that? And the basic test for multiple conspiracies is satisfied, too. There seems to be this principle that has crept in that you can't argue multiple conspiracies when the defendant is part of the alleged multiple conspiracies. I don't see that in the law. It's not appalling. It's not about – I don't think it's about not being entitled to it necessarily. It's about the judge having the ability to determine whether or not in a particular case it is appropriate or it's just going to end. But I don't know on what basis it was refused. To me, there was no basis. There was no basis. And for all we know, that jury said, oh, we have to add this stuff together to get over the 500 for the cocaine. This is really about the cocaine, not the fentanyl. I think I've tried your patience. Thank you. Thank you very much. All right. Thank you. Mr. Einhorn, we'll hear from you for a moment. John Einhorn again. Just one quick thing. The government pointed to a conversation between Mr. Watson and Mr. Wiley where they talk about runts. And I think, Your Honor, it's obviously marijuana. No, I never said that. You didn't say that. I said if he said that. If it was. I said if it's accepted that it's runts. Thank you. Runts is marijuana, then that's conspiring with Wiley. Exactly. And I just wanted to point out that during jury deliberations, and the government will bear me out on this, during jury deliberations, the jury sent a note to the judge and said, can you tell us what runts is? And the court rightfully, rightly responded to the jury note and said, you have to decide for yourself based on the evidence that you've heard at the trial, or worse to that effect. And so there is no evidence what runts is. And, in fact, there is no evidence that the conversation between Mr. Watson and Mr. Wiley had to do with this marijuana substance, runts, or whatever. Who knows what runts is, frankly? So I just wanted to add that. Thank you. Thank you very much. Thank you to all of you. We'll take the case under advisement.